UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                                Case No. 11-71731

TANZIL S. MABONE,                                        Chapter 13

            Debtor.                                         Judge Thomas J. Tucker
_____/

**OPINION REGARDING SANCTION MOTIONS**

**I. Introduction**

This case is before the Court on (1) United Car Company, Inc.'s motion entitled "Motion for Sanctions Against Frego & Associates" (Docket # 21), and (2) the sanctions part of United Car Company, Inc.'s motion entitled "Motion of United Car Company, Inc. For Relief From the Automatic Stay, for Waiver of Provisions of Fed. R. Bankr. P. 4001(a)(3), and for Contempt Sanctions Against the Debtor and her Counsel" (Docket # 37)(collectively the "Two Sanction Motions"). The Court held a hearing on the Two Sanction Motions on March 1, 2012, and then held an evidentiary hearing on April 16, 2012 and May 15, 2012. The Court then took the motions under advisement.

The Court has carefully considered all of the arguments and evidence presented by the parties at the evidentiary hearing. This opinion states the Court's findings of fact and conclusions of law. For the reasons stated in this opinion, the Court will deny each of the Two Sanction Motions.

**II. Background**

In the Two Sanction Motions, creditor United Car Company, Inc. ("UCC") seeks monetary sanctions against the Debtor in this Chapter 13 case, Tanzil Mabone, and against

Debtor's attorneys, Frego & Associates, to compensate UCC for the attorney fees and expenses it has incurred in connection with Debtor's bankruptcy case.

Debtor filed this Chapter 13 case on the morning of December 15, 2011. The next morning, Debtor filed a motion seeking an order compelling UCC to return to Debtor the 2003 GMC Envoy vehicle owned by Debtor (the "Vehicle"). UCC had sold the Vehicle to Debtor in June 2011, on credit, and had a security interest in the Vehicle. Several months before filing this bankruptcy case, Debtor had defaulted by failing to make her contractually-required payments to UCC. Eventually, UCC obtained a state court order for possession, and then caused the vehicle to be repossessed by a court officer, on December 8, 2011.[1] UCC still had possession of the Vehicle when Debtor filed this bankruptcy case.

On the afternoon of December 16, 2012, a few hours after Debtor filed her motion for return of the Vehicle, and after consulting with its current counsel, UCC agreed to return the Vehicle to Debtor. At UCC's invitation, Debtor came to UCC's business location and retrieved the Vehicle. As discussed in more detail below, Debtor could not start the Vehicle, so she had it towed to an auto repair shop.

Debtor had the Vehicle repaired, and then began driving it again. But sometime in either January or February 2012, the Vehicle was involved in an accident, and was "totalled." The Vehicle was insured at the time, however, and UCC was later paid by the insurance company, in an undisclosed amount viewed by the insurance company as the value of the vehicle.

On December 20, 2011, UCC filed the first of its Two Sanction Motions, seeking

---

[1] UCC apparently prefers to call this event a "seizure" of the Vehicle, rather than a "repossession," because it was done by a court officer acting under a court order. But the Court will use the term "repossession" in this opinion to refer to this event.

sanctions against Debtor's counsel (Docket # 21). On January 5, 2012, UCC filed the second of its Two Sanction Motions, which motion also sought relief from stay with respect to the Vehicle. (Docket # 37). Debtor then voluntarily dismissed this Chapter 13 case, on January 17, 2012.

Because Debtor voluntarily dismissed her case after UCC filed its motion for relief from stay, Debtor is ineligible to be a debtor in any new bankruptcy case for 180 days, under 11 U.S.C. § 109(g)(2). Debtor therefore may not file any new bankruptcy case before July 16, 2012.

### III. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and over these contested matters under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a)(E.D. Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(O).

### IV. Discussion

#### A. UCC's sanctions argument

Stated generally, in the Two Sanction Motions UCC seeks sanctions against Debtor and her attorneys on the following grounds: (1) that Debtor filed this bankruptcy case, and her Chapter 13 Plan (Docket # 32), in bad faith; (2) that Debtor and her attorneys filed the motion for return of the Vehicle, on December 16, 2011, and then failed to promptly withdraw that motion after UCC returned the Vehicle to Debtor, all in bad faith; and (3) that Debtor filed false and inconsistent schedules and other documents, particularly regarding her income, projected income, and the amount of the debt she owed to UCC.

#### B. UCC's unclean hands

The Court will deny UCC any relief, because the Court finds that UCC has unclean

3

11-71731-tjt    Doc 94    Filed 05/25/12    Entered 05/25/12 17:25:24    Page 3 of 8

hands. Based on the evidence presented, the Court finds that before UCC allowed the Debtor to come and tow her Vehicle away from UCC's premises on December 16, 2011, UCC disabled the Vehicle's ignition system, so that the Debtor would be unable to start the Vehicle. The evidence that persuades the Court of this includes the following:

- When UCC caused the Vehicle to be repossessed on December 8, 2011, the Vehicle was operable; it could be started.[2]

- UCC had sole possession of the Vehicle continuously from the time it was repossessed on December 8, 2011 until Debtor picked up the Vehicle on December 16, 2011. During this entire time only employees of UCC had access to the Vehicle; Debtor had no access to the Vehicle.[3]

- When Debtor came to pick up the Vehicle from UCC on December 16, 2011, the Vehicle would not start. Instead, it had to be pushed from UCC's lot into the street, and from there towed away to a mechanic chosen by Debtor.[4]

- As permitted by the contract between Debtor and UCC, UCC had installed in the Vehicle a GPS tracking device and a "starter interrupt device," which enabled UCC to know the location of the Vehicle while Debtor had possession of it, and also to prevent the Vehicle from starting.[5] UCC used these devices in vehicles it sold on credit, to help it locate and retrieve vehicles when customers defaulted in payment. UCC used these devices, in part, to compensate for the fact that, as with Debtor here, UCC did not run credit checks on customers before extending them credit.[6]

- UCC management was obviously unhappy with the prospect of having to return the Vehicle to Debtor after she filed bankruptcy, and briefly resisted the post-petition demands of Debtor's attorneys that the Vehicle immediately be returned to Debtor,

---

[2] Testimony of Tayser Mona (UCC's General Manager). Mr. Mona admitted that the vehicle was operable, and would start, although it was starting "rough," when it was repossessed.

[3] Testimony of Tayser Mona.

[4] *Id.*; *see also* Debtor Ex. H (a copy of which also is Creditor Ex. 14).

[5] Creditor Ex. 15 (Purchase Agreement) at 2; Testimony of Tayser Mona; Debtor Ex. H (reference in "Comments" section of invoice to "shut down device" in the Vehicle).

[6] Testimony of Tayser Mona.

4

until UCC's counsel advised UCC that it should return the Vehicle.[7]

- UCC's General Manager, Tayser Mona, indicated in his testimony that he did not know why the Vehicle would not start when Debtor came to get it on December 16, 2011. But on cross examination, he speculated about possible explanations for why the Vehicle would not start at that time, even though the Vehicle had been starting and running at the time of UCC's December 8, 2011 repossession of it. The possible explanations Mr. Mona offered were:

    o vehicles like this GM Vehicle "don't like to be towed" — towing can cause vehicles like this to go into a "security mode" that eventually will cause them not to start;

    o "parts go bad . . . things happen"

    The Court finds that these possible explanations do not apply to the Vehicle in this case, are not well supported, and are not credible.[8]

- The evidence includes an invoice dated December 16, 2011, and signed by Debtor with a date of December 21, 2011, from Oak Park Auto Center, for the repair of the Vehicle that Debtor obtained after she got the Vehicle back from UCC, at a cost of $532.50. The section of the invoice titled "Repairs Requested - Comments" states the following:

    > Won't start
    > Vehicle has been immobilized
    > GPS/shut down device disconnected and ignition
    > wires not reconnected[9]

    The repair done was described on the invoice as:

---

[7] The Court draws these conclusions from the combination of the testimony of William Blasses, one of UCC's attorneys; Tayser Mona, UCC's General Manager; and James Frego, one of Debtor's attorneys.

[8] Testimony of Tayser Mona. Mr. Mona also testified that when the Vehicle was given back to the Debtor on December 16, 2011, it was in the same condition as when it was repossessed on December 8. But Mr. Mona admitted that the Vehicle would start and run on December 8, and that it would not start on December 16. And he failed to offer any credible explanation for why it would not start on December 16.

[9] Debtor Ex. H; *see also* Creditor Ex. 14.

5

Replace ignition system module & rewire ignition system[10]

There is no credible, *innocent* explanation established by the evidence for why the Vehicle would not start when Debtor got it back from UCC on December 16, 2011. The Court finds that when UCC learned that Debtor had filed bankruptcy, and that UCC would have to return possession of the Vehicle to Debtor as a result of the bankruptcy filing, someone at UCC intentionally disabled the Vehicle so that Debtor would not be able to start it and drive it. Thus, the Court finds, UCC intentionally damaged Debtor's Vehicle, which upon filing of the bankruptcy case had become property of the bankruptcy estate. This was a deliberate, willful violation of the automatic stay by UCC. *See* 11 U.S.C. §§ 362(a)(3) and 362(a)(6).[11] And as explained in the next part of this opinion, this also means that UCC has unclean hands, and should get no relief from this Court.

**C. The "unclean hands" doctrine applies here.**

As stated by the United States Supreme Court, "bankruptcy courts . . . are courts of equity and "apply the principles and rules of equity jurisprudence.'" *Young v. U.S.*, 535 U.S. 43, 50 (2002)(quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939)). The Sixth Circuit Court of Appeals has similarly stated that "bankruptcy courts are courts of equity." *Doss v. Green* (*In re Green*), 986 F.2d 145, 150 (6th Cir. 1993).

---

[10] *Id.*

[11] The Court is not granting any relief to Debtor for this stay violation by UCC, because Debtor has not moved for or requested any such relief in this now-dismissed case. Debtor's counsel indicated during the evidentiary hearing that Debtor and her counsel had chosen not to seek sanctions against UCC. If Debtor had requested any sanctions or monetary relief against UCC, the Court could not award any such relief without first examining *Debtor's* conduct for unclean hands in this case, including UCC's charges that Debtor acted in bad faith and dishonestly in filing this case and in filing her schedules and plan. As it is, it is unnecessary to do this.

"A court of equity will not relieve a party with 'unclean hands.'" *Green*, 986 F.2d at 150. The Sixth Circuit in *Performance Unlimited, Inc. v. Questar Publishers, Inc.* explained that the doctrine

> of unclean hands may be employed by a court to deny . . . relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party. The doctrine of unclean hands requires that the alleged misconduct on the part of the plaintiff relate directly to the transaction about which the plaintiff has made a complaint. . . . Finally, the doctrine is not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct.

52 F.3d 1373, 1383 (6th 1995)(internal citations and quotation marks omitted); *see also Green*, 986 F.3d at 150 (The "[unclean hands] doctrine 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief. . . .'") (citation omitted).

"Michigan courts 'abide by the standard maxim that one 'who comes into equity must come with clean hands. . . .'" *Sutter v. U.S. Nat'l Bank* (*In re Sutter*), 665 F.3d 722, 729 (6th Cir. 2012)(citing *Rose v. Nat'l Auction Grp.*, *Inc.*, 646 N.W.2d 455, 461 (Mich. 2002)(quoting 2 Pomeroy's Equity Jurisprudence, ch. I, § 397, p. 90 (1941))). In *Sutter*, the Sixth Circuit described the scope and purpose of the unclean hands doctrine recognized by Michigan courts as

> a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the Appellant*. That doctrine is rooted in the historical concept of the court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good

> faith. This presupposes a refusal on its part to be the abettor on iniquity.

665 F.3d at 729 (citing *Rose v. Nat'l Auction Grp., Inc.*, 646 N.W.2d at 461)(quoting *Stachnik v. Winkel*, 230 N.W.2d 529, 532 (Mich. 1975)(italics in original)).

A court may raise the unclean hands doctrine *sua sponte* when facts warranting its application come to its attention. *Casa Nova*, *Inc. v. Casa Nova of Lansing*, *Inc.* (*In re Casa Nova of Lansing*, *Inc.*), 146 B.R. 370, 379 (Bankr. W.D. Mich. 1992)(citing *Stachnik v. Winkel*, 230 N.W.2d 529, 532 (Mich. 1975)); *see also Mitan v. Duval* (*In re Mitan*), 573 F.3d 237, 245 (6th Cir. 2009) ("[B]ankruptcy courts, as courts of equity, may always consider the presence of bad faith on the part of one of the parties when fashioning relief.")(citation omitted).

UCC's conduct, described above, gives it unclean hands. At a minimum, UCC is guilty of "unconscionability, or bad faith related to the matter at issue," *see Performance Unlimited*, 52 F.3d at 1383, so this Court will grant UCC no relief. It follows that UCC's Two Sanction Motions must be denied. Under the circumstances, the Court does not need to decide whether or to what extent the conduct of the Debtor or her attorneys in this case was in bad faith, wrongful, or otherwise sanctionable. The Court expresses no view on that subject.

**V. Conclusion**

For the reasons stated in this opinion, the Court will enter an order denying UCC's Two Sanction Motions.

**Signed on May 25, 2012**                     /s/ Thomas J. Tucker
                                               **Thomas J. Tucker**
                                               **United States Bankruptcy Judge**